**WAXMAN INDUSTRIES, INC., and Handi-Fix Stores of Indiana, Inc., Defendants-Appellants,**

v.

**TRUSTCO DEVELOPMENT COMPANY, Plaintiff-Appellee.**

No. 1–383A76.

Court of Appeals of Indiana, First District.

Oct. 25, 1983.

W. Rudolph Steckler, Paul L. Fields, Indianapolis, for defendants-appellants.

Richard J. Dick, Mitchell, Hurst, Pinkus, Jacobs & Dick, Indianapolis, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendants-appellants, Handi-Fix Stores of Indiana, Inc. (Handi-Fix), and Waxman Industries, Inc. (Waxman), appeal an adverse judgment rendered by the Boone Circuit Court without a jury in favor of plaintiff-appellee, Trustco Development Company (Trustco) in a suit for breach of a lease.

We affirm in part and reverse in part.

## STATEMENT OF THE FACTS

The facts, largely undisputed, which are necessary for this opinion are as follows: Trustco leased to Handi-Fix a storeroom in a shopping center then under construction by written lease dated May 19, 1977, and an amendment thereof dated September 9, 1977. The premises was described as 100′ × 30′, or 3000 square feet. Waxman guaranteed the lease. The lease was for a fixed term of five years, beginning January 1, 1978, and the monthly rental, as is relevant here, was $1,362.50. By letter dated March 1, 1978, Handi-Fix asserted eight defective items in the leasehold, including the complaint that the storeroom, by inside measurement, was only 29′5″ × 98′6″. Handi-Fix further stated that by reason of the eight deficiencies, rent was being paid under protest. However, on or about April 14, 1978, Handi-Fix executed a document, described by Trustco's managing officers as an estoppel letter, entitled "Acceptance of the Premises", which contained the following language:

> "... that Lessor has completed all construction required by the terms of such lease both with respect to the demised premises and the entire shopping center; that there are at this time no offsets or credits against rentals ... that no default by either party or grounds for cancellation exists."

The evidence discloses that the plans, which reflected that the complained-of differential between the square footage quotations resulted from the width of the walls, were made available to Handi-Fix at the time of or before the execution of the lease. The lease made no reference as to whether the distances referred to inside or outside measurement.

Handi-Fix vacated the premises on August 1, 1979 and so notified Trustco. Thereafter, with Trustco's cooperation, Handi-Fix attempted to sub-let the storeroom, but without success. The last rental

payment was made by Handi-Fix in January, 1980 in the amount of $1262.50, one hundred dollars short of the regular January payment. Trustco eventually found a new tenant, Robert O'Rourke, and relet the premises commencing September 1, 1981 for the monthly sum of $1625.00 for a fixed three-year period. Though Handi-Fix's term did not expire until December 31, 1982, Trustco terminated its lease on September 1, 1981, upon the authority of language in the lease, edited by us as follows:

"If the Lessee makes any default in respect to its covenants to pay rent ... the Lessor may thereupon take possession of the leased premises ... and re-let the same without such action being deemed an acceptance of a surrender of this lease or in any way terminating the Lessee's liability ... or the Lessor, at its own option may ... terminate this lease."

Thereafter Trustco brought suit for the breach of the lease seeking unpaid accrued rental damages for injuries to the premises, other miscellaneous items of damages, and attorney fees. Handi-Fix filed a counterclaim and set-off seeking credit against rental for the shortage in square footage of space and credit for the additional $325.00 per month rental that Trustco received from the new tenant from September 1, 1981 until December 31, 1982. The trial court entered a principal judgment for $32,914.00, of which $25,988.00 is represented by accrued rental payments from January, 1980 until September 1, 1981. The balance of the judgment is other various items of damage and interest not disputed here. The trial court also entered attorney fees of 33⅓%, or $10,971.09 and an additional contingent attorney fee of $2194.22 if collection efforts outside Indiana became necessary. Handi-Fix's set-offs and counterclaims were denied in their entirety.

## ISSUES

Handi-Fix and Waxman present the following issues for review:

I. Did the court err in awarding plaintiff-appellee a judgment without allowing a set-off to defendant-appellants for the difference between the actual square footage of the leased premises and the square footage upon which the rental in the lease was based?

II. Did the Court err in awarding plaintiff-appellee a judgment without allowing a set-off to defendant-appellants for the excess rental received by plaintiff from the subsequent lessees, for the remainder of the term of the lease?

III. Did the court err in awarding attorney fees in excess of that supported by the evidence?

IV. Did the court err in awarding attorney fees based upon the future contingency of how the judgment was enforced?

## DISCUSSION AND DECISION

*Issue I: Space.*

The evidence shows that at the time of, or prior to the lease, plans and drawings were furnished to Handi-Fix which showed the true dimensions of the premises. Subsequent to discovery of the rather insignificant shortage, and after the mailing of the March 1, 1978 complaint, Handi-Fix executed a blanket acceptance of the premises.

Waiver is an intentional abandonment or relinquishment of a known right; with reference to a breach of contract, it includes giving up the right to treat the contract as breached by the other party. *Ogle v. Wright,* (1977) 172 Ind.App. 309, 360 N.E.2d 240, 245; 6 I.L.E. *Contracts,* Sec. 233 (1958). A party who accepts a defective performance of a contract is liable for the contract price. 5A Corbin, *Contracts,* Sec. 711 (1957). One may, by reason of estoppel or ratification, be prevented from claiming that a lease is defective or invalid. 51C C.J.S. *Landlord and Tenant,* Sec. 228(2). The trial court was justified in finding from the evidence that Handi-Fix waived any default.

Further, the Latin phrase "de minimus" is applicable to Handi-Fix's complaint.

Handi-Fix has made no effort to demonstrate how it was damaged, or for that matter, even inconvenienced by the slight difference in the square footage or dimensions. The premises were used as a retail store. The measurements were in substantial conformity to the lease. We find no error in denying this set-off.

*Issue II: Mitigation of damages.*

■ Handi-Fix argues that the additional $325 per month rental payment received from Robert O'Rourke upon the reletting of the premises from September 1, 1981 until the termination of its lease on December 31, 1982 should be credited to it. It argues that even though it had vacated the premises, it had not surrendered the premises. Handi-Fix contends that prior to September 1, 1981, Trustco elected not to terminate the lease and continued to hold Handi-Fix liable for the rent. Handi-Fix did not consent to the termination of the lease; therefore, it was entitled to the credit as mitigation of damages when Trustco re-let the premises.

Handi-Fix cites *Grueninger Travel Service of Fort Wayne, Indiana, Inc. v. Lake County Trust Company,* (1980) Ind.App., 413 N.E.2d 1034, a case in which there was a dispute concerning whether a surrender had occurred, a fact which the lessor denied. However, no clause granting the lessor an option to terminate upon default was, as here, involved. Handi-Fix, in its argument, pointedly ignores the option to terminate available to Trustco. In the instant case, the evidence shows that the lease was in default and the parties attempted to relet the premises. Handi-Fix failed to find a sublessee, but Trustco eventually succeeded, at which time it exercised the option to terminate. It is immaterial that Handi-Fix did not consent to the termination of the lease. The proposition that Trustco could hold Handi-Fix accountable until such time as it found a new tenant at an increased rate and then terminate Handi-Fix's lease finds support in *Trick v. Eckhouse,* (1924) 82 Ind.App. 196, 145 N.E. 587. In *Trick,* the court stated:

> "The fact that the appellee [lessor] was able to rent the property at an increased rental is no reason why she should not recover the rent for the two months the building was vacant ..."

*Trick, supra,* at 588.

The above result was reached without benefit of an option clause such as the clause included in the lease in the present case. Our research has discovered no Indiana authority contrary to *Trick, supra,* and Handi-Fix has cited none.

In *Wanderer v. Plainfield Carton Corp.,* (1976) 40 Ill.App.3d 552, 351 N.E.2d 630, a case not dissimilar to the one at bar, the court observed:

> "If the lease was in fact terminated by notice so as to relieve the tenant of any further obligations for rent, the damages then accruing to the landlord could have become fixed and the tenant would be released from all further liability. If such were the case, the damages awarded by the trial court would be proper and there would be no credit for the tenant by reason of the excess rent."

*Wanderer, supra,* at 637.

A different result was reached in *Wanderer* only because the facts reflected that the lessor had not in fact terminated the lease by notice.

We find no error here.

*Issues III and IV: Attorney fees.*

These issues present a more serious problem. The lease provides that upon default "Lessee shall pay all costs and reasonable attorney fees ...". Trustco's evidence on reasonable attorney fees came from a witness, Richard J. Dick, its attorney. He testified that in commercial litigation such as this, a contingent fee agreement between the client and himself is not normal, and that his usual hourly rate is $70.00 per hour for the number of hours worked. Here, he had incurred 83 hours' worth of work, exclusive of the one day trial. In this particular case, he was not being paid on an hourly basis but was being paid on a contingent fee basis and would not be paid at all unless he recovered from Handi-Fix and Waxman.

He testified that the practice among most attorneys handling contingent fee collection cases of this sort is to receive one-third of the amount collected as a fee, and if it was necessary to initiate collection processes beyond the state, then the attorney fee would be forty percent (40%). Dick explained that it might be necessary to go to Ohio to enforce the judgment in the instant case. He further stated that normally an attorney will seek a fee greater than the hourly basis if his contract is on a contingency since there must be some kind of additional incentive if one is not receiving the hourly rate.

The question presented in these issues is whether the obligor on an instrument who is responsible for reasonable attorney fees is bound by a contingent fee contract between the obligee and his attorney. This question has never been decided in Indiana by the courts of review.

We first examine contingent fee contracts in general. A contingent fee contract generally is recognized as binding between an attorney and his client. *Fitzgerald v. Wasson Coal Mining Corporation,* (1965) 138 Ind.App. 176, 212 N.E.2d 398; *Draper v. Zebec,* (1941) 219 Ind. 362, 37 N.E.2d 952. In *Draper,* the court said:

"... While the propriety of *contracts for contingent fees* has been vehemently debated, yet, when such contracts are fairly made between counsel and clients, made in good faith and free from fraud or imposition, they are not illegal, and are as obligatory as between other parties. It may and does happen that persons who have rights, but no means to pursue them, are obliged to resort to this means to pursue them, are obliged to resort to this means to pursue them, are obliged to resort to this means of procuring legal redress. And it is the duty of the courts to carefully scrutinize such contracts to see that no improper advantage is taken either of the ignorance or necessity of those who enter into them, and if it appears that they are obtained by any undue influence of the attorney over the client, or by fraud or imposition, or that the compensation is clearly excessive, the party aggrieved will be protected. *The fact that the practice of stipulating beforehand for professional fees, contingent on the result* of the litigation, is sometimes abused, and exposes the profession to misapprehension and illiberal remark, is not sufficient excuse for refusing to enforce such a contract, when characterized throughout by 'all good fidelity to the client.'" (Our Emphasis)

*Draper, supra,* at 957–58.

The Code of Professional Responsibility addresses the problem of fees:

"EC 2–18

The determination of the reasonableness of a fee requires consideration of all relevant circumstances, including those stated in the Disciplinary Rules. The fees of a lawyer will vary according to many factors, including the time required, his experience, ability, and reputation, the nature of the employment, the responsibility involved, and the results obtained. Suggested fee schedules and economic reports of state and local bar associations provide some guidance on the subject of reasonable fees. It is a commendable and long-standing tradition of the bar that special consideration is given in the fixing of any fee for services rendered a brother lawyer or a member of his immediate family.

EC 2–19

As soon as feasible after a lawyer has been employed, it is desirable that he reach a clear agreement with his client as to the basis of the fee charges to be made. Such a course will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client. It is usually beneficial to reduce to writing the understanding of the parties regarding the fee, *particularly when it is contingent.* A lawyer should be mindful that many persons who desire to employ him may have had little or no experience with fee charges of lawyers, and for this reason he should explain fully to such persons the reasons for the particular fee arrangement he proposes.

EC 2–20

Contingent fee arrangements in civil cases have long been commonly accepted in the United States in proceedings to enforce claims. The historical bases of their acceptance are that (1) they often, and in a variety of circumstances, provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim, and (2) a successful prosecution of the claim produces a res out of which the fee can be paid. Although a lawyer generally should decline to accept employment on a contingent fee basis by one who is able to pay a reasonable fixed fee, it is not necessarily improper for a lawyer, where justified by the particular circumstances of a case, *to enter into a contingent fee contract in a civil case with any client who, after being fully informed of all relevant factors,* desires that arrangement. Because of the human relationships involved and the unique character of the proceedings, contingent fee arrangements in domestic relation cases are rarely justified. In administrative agency proceedings contingent fee contracts should be governed by the same considerations as in other civil cases. Public policy properly condemns contingent fee arrangements in criminal cases, largely on the ground that legal services in criminal cases do not produce a res with which to pay the fee."
(Emphasis added)

Though there is no specific holding in Indiana, authority exists that an agreement for a contingent fee can never be implied, but it must be a matter expressly contracted for between the attorney and his client. 7 Am.Jur.2d, *Attorney at Law,* Sec. 254. *Fleming v. Phinizy,* (1926) 35 Ga.App. 792, 134 S.E. 814; *Citizens and Southern National Bank v. Hodnett,* (1976) 139 Ga.App. 839, 229 S.E.2d 792; *Sullivan v. Fawver,* (1965) 58 Ill.App.2d 37, 206 N.E.2d 492; *Thurston v. Travelers' Insurance Company,* (1934) 128 Neb. 141, 258 N.W. 66; *Cooke v. Gove,* (1941) 61 Nev. 55, 114 P.2d 87; *Crumlish's Administrator v. Shenandoah Valley R. Co.,* (1985) 40 W.Va. 627, 22 S.E. 90; *Podell v. Gronik,* (1938) 229 Wis. 238, 282 N.W. 53.

*Podell* held that such agreement must be entered prior to the service performed. *Podell, supra,* at 54. Otherwise, the attorney was entitled to a reasonable fee. *Id.*

The plain implication of *Draper, supra,* and the sections of the Code of Professional Responsibility, supported by the authorities of other jurisdictions, constrain us to hold that a contingent fee, even between an attorney and his client, is not enforceable unless it is founded upon a prior agreement. It then follows inexorably that a contingent fee contract of the obligee on an instrument with his attorney cannot be enforced against the party obligor who has merely agreed in the instrument to pay a "reasonable attorney fee" for the fundamental reason that the obligor has never agreed or has never even been consulted concerning the arrangement. Such a result finds support in at least two other jurisdictions.

In *Engebretson v. Putnam,* (1977) 174 Mont. 409, 571 P.2d 368, and *Olson v. Carter,* (1977), 175 Mont. 105, 572 P.2d 1238, both winning parties had entered into contingent fee arrangements with their attorneys. On the basis of these agreements alone, the trial judge awarded the parties the contingent fee amounts as reasonable attorney fees. The Supreme Court of Montana overturned the award in both cases, noting that it "disapprove[d] of an award of attorney fees based on this type of documentation". *Engebretson, supra,* at 372. *Olson, supra,* at 1241 (citing *Engebretson*). The court further stated "the result of the negotiations between an attorney and his client as to their fee agreement is not controlling in fixing a reasonable attorney fee to assess against an opposing party". *Engebretson, supra,* at 372. Finally, the court suggested that the reasonable fee be determined in accordance with guidelines similar to those enumerated in DR 2–106(B). *Id.* See *State, by Head v. Paulson,* (1971) 290 Minn. 371, 188 N.W.2d 424, cited in *City of Minnetonka v. Carlson,* (1978), Minn., 265 N.W.2d 205, 206.

In *U.S. Aircraft Financing, Inc. v. Jankovich,* (1980) Ind.App., 407 N.E.2d 287, the

Fourth District overturned an award of attorney fees in the amount of $30,000.00 for the plaintiff because Jankovich's counsel had failed to present evidence regarding hours expended or out-of-pocket expenses. *Jankovich, supra,* at 295. The court indicated that the award appeared excessive since "the record [did] not indicate any justification for the amount awarded." *Id.* The *Jankovich* court went on to advise that an attorney look to the factors set down in the *Code of Professional Responsibility,* DR 2–106(B), in order to determine the information needed to establish the attorney fee claim. *Id.* at 296. DR 2–106(B) states:

A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether it is fixed or contingent.

*Jankovich* also can be used to support the proposition that an obligor is not bound by the agreement between the obligee and his attorney. Quite clearly, if there is no prior contract for contingent fees included in the instrument, then subsection (8) above is inapplicable to the consideration of fees.

The benefits of a contingent fee contract between an attorney and client in litigation consisting of money demands are quite obvious. If no money is collected at all, the client is not obligated to pay fees, and in consideration of the absence of such risk, he is willing to pay the larger fee if money is collected. The attorney is willing to risk no recompense for his efforts in return for the possibility of a windfall. Such considerations are absent from the case of an obligor on an instrument. A contingent fee between the obligee and his attorney becomes a much higher fixed fee to the obligor. Such an arrangement is susceptible to abuse and inappropriate for this type of situation.

We reverse this cause as to the attorney fee and direct the trial court to fix a reasonable attorney fee which does not include a consideration of the contingent fee contract. Further, in the event that post-trial fees are incurred, Trustco may petition the court accordingly. Rule DR 2–106(B) will serve as a proper guideline. This cause is in all other respects affirmed. Costs of appeal are ordered paid two-thirds to appellant and one-third to appellee.

Judgment affirmed in part and reversed in part.

ROBERTSON, P.J., and RATLIFF, J., concur.